*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CJM, Minor.

FOR PUBLICATION
November 21, 2024
10:08 AM

No. 367565
Oceana Circuit Court
Family Division
LC No. 21-015038-NA

Before: GADOLA, C.J., and K. F. KELLY and MARIANI, JJ.

K. F. KELLY, J. (*dissenting*).

In the proceedings below, the trial court concluded that termination of respondent's parental rights was in CJM's best interests. The record shows that the trial court carefully considered alternatives to termination, including guardianship, but ultimately determined that termination was in CJM's best interests. I agree with this determination and respectfully dissent.

Respondent-father argues on appeal, and the majority agrees, that the trial court clearly erred because it failed to consider whether Pulsipher was CJM's "relative" under MCL 712A.13a(1)(j). According to respondent-father, although CJM and Pulsipher were not biologically related, recent amendments to MCL 712A.13a changed the character of their relationship under the law such that Pulsipher would be considered CJM's relative for purposes of the statute. And because, according to respondent-father, placement with a relative weighs against termination, the matter should be reversed and remanded for consideration of the issue.

As an initial matter, I pause to clarify my understanding of when and whether placement of a minor with a relative weighs against termination. It is a correct statement of the law that when a child is placed with a relative and the court has determined that the "child should not be returned to his or her parent," the court may nevertheless not initiate termination proceedings if the "child is being cared for by relatives." MCL 712A.19a(8)(a); see also *In re Mason*, 486 Mich 146, 164; 782 NW2d 747 (2010) ("[A] child's placement with relatives weighs against termination under MCL 712A.19a(6)(a), which expressly establishes that, although grounds allowing the initiation of termination proceedings are present, initiation of termination proceedings is not required when the children are 'being cared for by relatives.' "). However, once termination proceedings have

begun, it is no longer accurate to say that placement with relatives weighs against termination when the court is making its best interests determination; rather, *it is simply another factor the court must consider* and, in a vacuum, neither weighs in favor nor against termination:

> [B]ecause a child's placement with relatives weighs against termination under MCL 712A.19a(6)(a), the fact that a child is living with relatives when the case proceeds to termination is a factor to be considered in determining whether termination is in the child's best interests. Although the trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests, the fact that the children are in the care of a relative at the time of the termination hearing is an explicit factor to consider in determining whether termination was in the children's best interests. A trial court's failure to explicitly address whether termination is appropriate in light of the children's placement with relatives renders the factual record inadequate to make a best-interest determination and requires reversal. [*In re Olive/Metts Minors*, 297 Mich App 35, 43; 823 NW2d 144 (2012) (quotation marks and citations omitted).]

With this clarification in mind, I turn to the statutory language at issue. The Court's primary goal when interpreting a statute is to ascertain and give effect to the Legislature's intent. *In re TEM*, 343 Mich App 171, 180; 996 NW2d 850 (2022). The Court, therefore, must "give the words selected by the Legislature their plain and ordinary meaning, and by enforcing the statute as written." *Id*. (quotation marks and citation omitted). "If a statute is unambiguous, it must be applied as plainly written." *Id*.

MCL 712A.13a(1)(j)'s definition of "relative" was amended while this case was pending. See 2022 PA 200, effective October 7, 2022. Relevant here, the amendment expanded the definition of "relative" to include certain fictive kin:

> (j) "Relative" means an individual who is at least 18 years of age and is either of the following:
>
> * * *
>
> (ii) Not related to a child within the fifth degree by blood, marriage, or adoption but who has a strong positive emotional tie or role in the child's life or the child's parent's life if the child is an infant, as determined by the department or, if the child is an Indian child, as determined solely by the Indian child's tribe. As used in this section, "Indian child" and "Indian child's tribe" mean those terms as defined in section 3 of chapter XIIB. [MCL 712A.13a(1)(j)(*ii*).]

Thus, an individual may be considered a "relative" under subsection (*ii*) if the individual is at least 18 years old and has a "strong positive emotional tie or role" in either: (1) the child's life; or (2) the parent's life, if the child is an infant. See *id*. Under the statute, it is DHHS's responsibility to "determine[]" whether an individual is a relative, notwithstanding the lack of biological or familial relationship. Accordingly, Pulsipher could be considered CJM's "relative" on the basis of Pulsipher's emotional ties to CJM, or his parents, if CJM were an "infant." See *id*. In this case, CJM has been with Pulsipher since birth.

The term "infant" is not defined in the statute and, therefore, the Court must give the word its plain and ordinary meaning. See *In re TEM*, 343 Mich App at 180. Under the common law, the word "infant" is traditionally understood as a person who has not yet attained the age of majority. See *Keating v Mich Central R Co*, 94 Mich 219, 221; 53 NW 1053 (1892) ("Persons who have not attained the age of majority are infants . . . ."); *Payette v Fleischman*, 329 Mich 160, 162-163; 45 NW2d 16 (1950) (equating "infants" with "minors" and stating that a contract executed by an "infant" is voidable). The Legislature clearly meant something different by the term "infant," however, as all minors in the foster care system would be considered "infants" under such a definition. See *In re Neubeck*, 223 Mich App 568, 572-573; 567 NW2d 689 (1997) ("[T]his Court should avoid any construction that would render a court rule, or any part of it, surplusage or nugatory."). The term is defined elsewhere under Michigan law as "a child who is 12 months old or younger." See MCL 333.5883(3). This formulation comports more with the intent of the Legislature; however, regardless of the exact age cutoff for an "infant" under MCL 712A.13a(1)(j)(*ii*), I would have little issue concluding here that CJM was an "infant" when he was placed with Pulsipher at birth. Thus, while there was evidence in the record that CJM and Pulsipher shared certain emotional ties, given that CJM was a newborn when placed with Pulsipher, the appropriate analysis to determine whether she is a "relative" would be the existence of strong emotional ties between Pulsipher and respondents. See MCL 712A.13a(1)(j)(*ii*) (stating that when the child is an infant, the proper analysis is the strong emotional ties between relative and the parents).

On that point, the record is silent, and provides no support to respondent-father's argument that the trial court clearly erred when it failed to consider Pulsipher as a "relative" under MCL 712A.13a(1)(j)(*ii*). Testimony from Pulsipher established that her home was the only one that CJM had "ever really known," and she had taken care of him off and on for the first two years of his life. According to respondent-father's caseworker, respondent-father only started insisting that Pulsipher was trying to take CJM away from him after he started using methamphetamine again in March 2022.

Respondent-father also asserts that the trial court failed to consider the bond he shared with CJM when the court determined that termination was in CJM's best interests. The court, however, expressly acknowledged that there was a bond between respondent-father and CJM. However, as the court noted, respondent-father's inconsistent attendance at parenting times caused CJM serious emotional instability, which was particularly harmful given his young age. Respondent-father had also been incarcerated because of his substance abuse since CJM was approximately one week old and demonstrated sobriety for only two months following his release from prison. Respondent-father consistently tested positive for methamphetamine since March 2022, and he was subsequently reincarcerated in August 2022 as a result of his substance abuse. While "[i]ncarceration alone is not a sufficient reason for termination of parental rights," *Mason*, 486 Mich at 146, respondent-father also never obtained appropriate housing during the eight months that he was not incarcerated. Respondent-father demonstrated "some benefit" from the supportive foster care visitation and education program during his parenting times, but he never completed the program and inconsistently attended parenting times, which greatly affected CJM's emotional stability. When respondent-father did attend parenting time, he was often under the influence of methamphetamine.

He was referred to a program to assist him in obtaining suitable housing, which was also terminated because of his failure to participate. When respondent-father did report that he had obtained suitable housing, his parole officer determined that the home was uninhabitable and he did not have permission to be there. Respondent-father was referred to a supportive foster care visitation and education program to assist him with parenting skills, but he missed four appointments and faced dismissal from the program for lack of participation. In August 2022, he was incarcerated for new criminal charges and various parole violations after he was found trespassing with drug paraphernalia and a modified air rifle.

DHHS caseworkers testified that termination of respondent's parental rights was in CJM's best interests because, while there was "some bond" between respondent-father and CJM, the minor had never been in respondent-father's care since he was born, respondent-father had not addressed any of the concerns that initiated the proceedings in this case, and respondent-father was reincarcerated in August 2022. Respondent-father was repeatedly referred to substance abuse services and completed some initial assessments, but he never "follow[ed] through with the actual service recommendations." Respondent-father reported that he was participating in a substance abuse program following his reincarceration in August 2022, but his caseworker was unable to verify his participation in the program. Though respondent-father demonstrated "some benefit" from the supportive foster care visitation and education program, he never completed the program. Respondent-father inconsistently attended parenting times until he stopped attending them entirely in July 2022. Conversely, there was strong evidence that Pulsipher had adequately provided for CJM's needs his entire life and wanted to adopt him.

On the basis of this record, I would affirm the trial court's order concluding that termination was in CJM's best interests.

/s/ Kirsten Frank Kelly